**Clevon Jamel JENKINS, Petitioner,**

v.

**Thomas E. BYRD, Warden, Telfair State Prison, Respondent.**

**No. CV 498–167.**

United States District Court,
S.D. Georgia,
Savannah Division.

June 21, 2000.

Robert M. Kelly, White & Case, LLP, New York City, for Clevon Jamel Jenkins, plaintiff.

Paula K. Smith, Atlanta, GA, for Thomas E. Byrd, Warden, defendant.

## *ORDER*

NANGLE, District Judge.

Before the Court is the pro se petition of Clevon Jamel Jenkins [1] for writ of habeas corpus pursuant to 28 U.S.C. § 2254 asking the Court to vacate; set aside or correct sentence. For the reasons set forth below, petitioner's petition is denied.

## I. PROCEDURAL HISTORY

On December 13, 1993, petitioner Clevon Jamel Jenkins was jointly indicted with Shawn Brown, Cedric Brown, and Maurice Fleming by the Liberty County Grand Jury for the murder and armed robbery of Robert Franklin Hodges. Br.Supp. Answer–Resp. at 1 (Doc. 13). The state gave notice of its intent to seek the death penal-

---

1. Jenkins's original petition was filed by Robert M. Kelly of White & Case in New York. Mr. Kelly's pro hac vice application was denied for failing to have his designated local counsel make a written appearance in the case. Mr. Kelly did not refile his petition to appear pro hac vice.

ty against petitioner. *Id.* Pursuant to O.C.G.A. § 17–10–35.1, several pretrial rulings, including the admissibility of petitioner's statements to police, were affirmed on interim appeal. *Id.; Jenkins v. State,* 265 Ga. 539, 458 S.E.2d 477 (1995) ("Jenkins I"). Following a week-long jury trial beginning August 28, 1995, petitioner was found guilty of malice murder and armed robbery. Br.Supp. Answer–Resp. at 1; Resp't's Ex. 16 at 2018–19. At the sentencing phase on September 2, 1995, the jury found the existence of one statutory aggravating circumstance, that petitioner committed the murder while engaged in the commission of armed robbery, and imposed a sentence of life without parole. Resp't's Ex. 16 at 2130–32. The trial court imposed a second life sentence for the crime of armed robbery to be served consecutively to the life sentence for murder. *Id.* at 2132–33.

Petitioner filed a motion for new trial on September 6, 1995. Resp't's Ex. 8, Clerk's Index, at 2. This motion for new trial was amended to include claims for ineffective assistance of counsel on March 6, 1997. Resp't's Ex. 8, Clerk's Record, at 349. On March 14, 1997, an evidentiary hearing was held on the motion for new trial. *Id.* at 413. The trial court denied the motion for new trial on May 6, 1997. *Id.* at 426. Petitioner filed a notice of appeal on June 2, 1997. *Id.* at 2. Petitioner's conviction and sentence were affirmed by the Georgia Supreme Court on October 6, 1997. *Jenkins v. State,* 268 Ga. 468, 491 S.E.2d 54 (1997) (*"Jenkins II"*). The United States Supreme Court denied certiorari on March 23, 1998. *Jenkins v. Georgia,* 523 U.S. 1029, 118 S.Ct. 1318, 140 L.Ed.2d 481 (1998). Petitioner filed this petition on July 16, 1998, challenging his Liberty County conviction on constitutional grounds.

## II. BACKGROUND

At petitioner's jury trial, witnesses testified that Terry Roberts drove petitioner, Cedric and Shawn Brown, and Maurice Fleming to Hodges Grocery Store in Riceboro, Georgia on October 8, 1993. Roberts remained in the car and Shawn Brown kept lookout while petitioner, Cedric Brown, and Maurice Fleming robbed the store. Roberts testified that Cedric Brown and petitioner were armed with .25 caliber pistols. During the course of the robbery, grocer Bobby Hodges was shot five times in his face, neck and shoulder. One shot, fired by Cedric Brown, inflicted a potentially fatal wound to Hodges's sinus cavity. The fatal shot passed through soft tissue nicking Hodges's jaw bone before severing his carotid artery, causing him to quickly bleed to death. A damaged bullet fired from the weapon carried by petitioner was found at the scene. This bullet's damage was consistent with the damage the fatal bullet would have sustained.

Petitioner, Cedric Brown, and Maurice Fleming then left the store with money, food stamps, and perfume stolen from the store. All five men hurriedly left the scene in Terry Roberts's car. While in the car, petitioner and Cedric Brown allegedly stated that they shot Hodges and joked about the items stolen from the store. Minutes after the crime, Hodges was discovered by customers to the store; help was summoned, but Hodges died shortly thereafter. After the robbery proceeds were divided, petitioner, Cedric Brown, and Maurice Fleming fled to Florida on a Greyhound bus.

Miami authorities arrested the men at a local motel and discovered a food stamp in their hotel room which was traced back to a Riceboro citizen who shopped at Hodges Grocery. While being transported to a Miami jail, petitioner allegedly told a Florida police officer, James Smith, that he only shot Hodges once. Petitioner allegedly later told Kenneth McCall, a Georgia cellmate, that he shot the victim twice and was the first to shoot him.

Petitioner alleges that his conviction should be set aside for nineteen reasons: (1) that the trial court erred by allowing improper comments by the prosecutor regarding petitioner's failure to testify; (2) that the trial court erred by admitting

hearsay testimony from "silent witnesses"; (3) that the trial court erred by delivering improper instructions to the jury; (4) that the trial court erred by failing to submit the sufficiency of corroboration evidence to the jury; (5) that there was insufficient evidence to convict petitioner of malice murder beyond a reasonable doubt; (6) that the trial court erred by excluding evidence of petitioner's co-defendants' guilty pleas during the guilt phase of the trial; (7) that the prosecutor allowed testimony known to be false and misleading to stand uncorrected in the record; (8) that the prosecutor failed to disclose exculpatory *Brady* material; (9) that the trial court erred by admitting hearsay evidence during the testimony of Investigator Gray; (10) that the trial court erred by admitting hearsay statements made by petitioner's co-conspirators; (11) that the trial court erred by failing to instruct the jury that the testimony of a co-conspirator regarding the existence of a conspiracy must be corroborated; (12) that the trial court erred by admitting a coerced confession; (13) that petitioner's trial counsel were ineffective; (14) that the trial court erred in denying petitioner's motion for change of venue due to pretrial publicity; (15) that the trial court erred by refusing to answer the jury's question concerning when petitioner would be eligible for parole; (16) that the trial court erred by excluding evidence of petitioner's co-defendants' guilty pleas at the penalty phase of the trial; (17) that the Georgia life without possibility of parole statute, O.C.G.A. § 17-10-31.1, is unconstitutional; (18) that the Georgia courts erred in refusing to consider the cumulative effect of multiple errors committed at trial; and (19) that the amended 28 U.S.C. § 2254(d) is unconstitutional insofar as it limits the federal courts' ability to apply federal law.

**2.** The *Williams* opinion was highly fractured, with the majority opinion on Parts I, III, and IV delivered by Justice Stevens and the majority opinion on Part II delivered by Justice

## III. STANDARD OF REVIEW

The Anti–Terrorism and Effective Death Penalty Act of 1996, ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, created a standard of review for federal courts to use when reviewing the decisions of state courts under the habeas corpus statute. The Act became effective on the date it was signed into law, April 24, 1996. *See Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996); *Hunter v. United States,* 101 F.3d 1565, 1568 (11th Cir.1996) (en banc). The recently amended § 2254(d) provides in relevant part:

> (d) An application for a writ of habeas corpus ... shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254 (1994 & West Supp.1997). The Supreme Court has recently determined how it will apply this new standard of review in *Williams v. Taylor,* —— U.S. ——, ——, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).[2]

O'Connor. Because the interpretation of amended § 2254(d) was decided in Part II, the Court here quotes from Justice O'Connor's opinion.

In *Williams*, the Supreme Court held that " § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Id.* First, the federal court evaluating a habeas petition under § 2254(d)(1) must determine the applicable "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This law can be found in "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 120 S.Ct. at 1523. Further, any precedent or legal rule that would qualify as an old rule under the analysis of *Teague v. Lane*[3] also constitutes clearly established federal law under § 2254(d)(1). *Williams*, 120 S.Ct. at 1523. However, the source of clearly established law is restricted to the jurisprudence of the United States Supreme Court. *Id.*

Next, the court must determine whether one of the two conditions set forth in § 2254(d) applies.[4] A state court decision is "contrary to" clearly established federal law if the state court arrived at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decided a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Id.* A state court decision is an "unreasonable application" of clearly established federal law if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Id.* The determination of unreasonableness is an objective one, and the federal court may not issue a writ of habeas corpus simply because it concludes in its independent judgment that the state court was erroneous or incorrect. *Id.* at 1521–22.

Therefore, two principal standards control this Court's review of Jenkins's habeas petition: first, under § 2254(e), the state court's determinations of factual issues are presumed correct unless the petitioner presents clear and convincing evidence that the state court determinations were erroneous. Secondly, under § 2254(d), claims decided on the merits in a state court cannot be the basis for habeas relief unless the state court ruling fails to pass muster under a *Williams* analysis.

## IV. ANALYSIS

### A. Prosecutorial Comments in Summation on Failure to Testify (Ground One)

Petitioner asserts that he was denied his Fifth Amendment privilege against self-incrimination as a result of the prosecutor's allegedly improper comments regarding petitioner's failure to testify or present evidence. Petitioner specifically objects to four comments by the prosecutor in this case:

> Each witness has testified. The defense, on each witness, has had the opportunity to present evidence and under cross-examination to refute the State's evidence. Is there any evidence that has been presented by the defendant that refutes what the State's evidence is?

Resp't's Ex. 16 at 1925.

> We have presented evidence as to this defendant's involvement, we have pre-

---

**3.** Under *Teague,* a federal court evaluating a habeas petitioner's claim that he should have had the benefit of a rule of constitutional law must "survey the legal landscape" to determine whether the rule is "new." A rule is not "new" if the state court considering the habeas petitioner's claim would have felt compelled by existing precedent to conclude that the rule petitioner seeks was required by the Constitution. *Teague v. Lane,* 489 U.S. 288, 301, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

**4.** "Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) 'was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams,* 120 S.Ct. at 1523.

sented evidence as to this defendant's statement. Has the defense presented any evidence, any evidence to refute the State's evidence? I think the answer to that is clearly, no.

*Id.* at 1925–26.

As I was saying before the objection was made, that the State's contention is that the defendant, the defense in this case has offered no evidence that would refute the testimony of the State's witnesses as they've testified in this case.

*Id.* at 1929.

The second part of this State's evidence is the admissions by the defendant.... So there's three folks that have come into this courtroom, sat on this stand under oath and said, "This man admitted to shooting Mr. Robert Franklin Hodges." And we contend that evidence has not been refuted in any way.

*Id.* at 1938–39.

■ The Supreme Court has clearly established that the prosecutor in a criminal case cannot comment on the accused's silence at trial and cannot ask the jury to draw adverse inferences from that silence. *United States v. Robinson,* 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988); *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The Eleventh Circuit has held that prosecutorial statements are improper if they are "manifestly intended" as a comment on the defendant's silence or if they "would naturally and necessarily be understood by the jury" as a comment on his silence. *Matire v. Wainwright,* 811 F.2d 1430, 1435 (11th Cir.1987); *United States v. Vera,* 701 F.2d 1349, 1362 (11th Cir.1983).

■ The Georgia Supreme Court found that the prosecutor's statements, read in context, did not constitute comment on petitioner's decision not to testify "but rather permissibly noted the failure of the defense to rebut the State's evidence." *Jenkins II,* 491 S.E.2d at 58. Comments on the defense's failure to rebut the state's evidence are improper only if they would necessarily be understood by the jury as a comment on his silence.

*United States v. Garcia,* 13 F.3d 1464, 1474 (11th Cir.1994); *Matire,* 811 F.2d at 1435. Comments addressing the failure of the defense to rebut the prosecution's evidence are not per se impermissible. *Garcia,* 13 F.3d at 1474 (holding that comments on defense's failure to rebut testimony of key prosecution witness was not comment on defendant's failure to testify). Reading the comments at issue here in context, it is clear that they were aimed at the defense's failure to produce evidence rather than at the petitioner's failure to testify. Consequently, the statements would not necessarily have been understood to be comments on petitioner's silence.

Petitioner cites numerous circuit cases holding that the prosecutor may not comment on a defendant's failure to call witnesses if the only potential witness was the defendant himself. *See Bergmann v. McCaughtry,* 65 F.3d 1372, 1377 (7th Cir. 1995); *Sidebottom v. Delo,* 46 F.3d 744, 759 (8th Cir.1995); *United States v. Sblendorio,* 830 F.2d 1382, 1391 (7th Cir.1987); *Davis v. United States,* 357 F.2d 438, 441 (5th Cir.1966). However, this legal rule has never been clearly established by the United States Supreme Court. Thus, under *Williams,* this rule of law cannot be the basis for habeas relief. *Williams,* 120 S.Ct. at 1523. Consequently, petitioner has failed to show that the prosecutor's comments violated his Fifth Amendment right to remain silent.

**B. Improper Admission of Hearsay—Testimony as to Silent Witnesses (Ground Two)**

■ Petitioner asserts that the trial court violated his Sixth Amendment right of confrontation by allowing Investigator Gray to testify as to hearsay from silent witnesses. Gray testified that he received information from unidentified silent witnesses which caused him to believe petitioner was involved in the robbery and murder of Mr. Hodges. Resp't's Ex. 15 at 1724–27. Petitioner admits that the content of the statements made by the silent witnesses was never revealed to the jury,

but asserts that Gray's testimony was "tantamount to a hearsay statement by these witnesses that petitioner was one of the perpetrators." Pet'r's Mem.Supp.Pet. Habeas Corpus at 32–33 (Doc. 3).

The Supreme Court has clearly established that the Confrontation Clause does not necessarily prohibit the admission of hearsay statements against a criminal defendant. *Idaho v. Wright,* 497 U.S. 805, 813, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Rather, the Clause requires that hearsay statements, which are admissible under exceptions to the hearsay rule, bear adequate indicia of reliability. *Id.* at 814–15, 110 S.Ct. 3139 (quoting *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). The Supreme Court has not, however, addressed the issue of whether statements from an officer that information was received from unidentified witnesses, without stating the content of the information, are tantamount to hearsay.

The Eleventh Circuit and the former Fifth Circuit have held that statements by an officer concerning information received during his investigation which amount to substantive evidence of a defendant's guilt violates the Confrontation Clause. *Harris v. Wainwright,* 760 F.2d 1148, 1151 (11th Cir.1985) ("The district court correctly saw the issue as whether [the officer's] recital that he obtained information ... was substantive evidence of petitioner's guilt, both because it bolstered [the identification testimony of other witnesses] and, ... tended to connect defendant with the crime."); *Hutchins v. Wainwright,* 715 F.2d 512, 515 (11th Cir.1983) (holding that reference to the statements of an unidentified eyewitness who implicated petitioner in the crime is inadmissible under the Constitution); *Favre v. Henderson,* 464 F.2d 359, 362 (5th Cir.1972) (holding that testimony of officer as to statements by confidential informers implicating petitioner in the crime is inadmissible hearsay).[5]

Investigator Gray's testimony about information received from silent witnesses did not serve to implicate petitioner in this crime. Indeed, both references to information received from unidentified witnesses tended to implicate Cedric Brown and not petitioner.

Q. Okay. When did y'all receive the first lead as to the identity of the perpetrators in this case?

A. The investigation revealed that there was a witness across the street that saw some black males coming down the road and one of 'em was Cedric Brown. He knew him, going down the sidewalk, around the time the incident occurred.

Q. Okay. So—so, one possible suspect at that time was identified, is that correct?

A. That's correct.

Resp't's Ex. 15 at 1724–25.

Q. Okay. Without going into what—what information came in, did y'all later receive a silent witness call that was assist—some assistance to you?

A. That is correct. Around 12:30 the next day. That'd been on Saturday.

Q. Okay. Following this information that y'all began to develop in this case, were some search warrants issued by the Sheriff's Office?

A. That's correct.

Q. And those searches took place in what area?

A. In the Riceboro area at Cedric Brown's grandmother's house and Terry Moten, Willie Moten's house.

Q. Okay. Was Cedric Brown located . . .

A. He was not.

*Id.* at 1726. The testimony which tended to implicate petitioner was testimony concerning statements made by Terry Roberts, a co-conspirator who testified later in the trial.[6] Admission of hearsay state-

---

**5.** Fifth Circuit cases decided prior to October 1, 1981 are binding on the Eleventh Circuit under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

**6.** This testimony by Investigator Gray is as follows:

ments by persons who later testify at trial does not violate the Confrontation Clause under the rationale of *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) and *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). *Roberts*, 448 U.S. at 65, 100 S.Ct. 2531 ("In the usual case (including cases where prior cross-examination has occurred), the prosecution *must either produce*, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.") (emphasis added); *Green*, 399 U.S. at 162, 90 S.Ct. 1930 ("For where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem."). Accordingly, the admission of this testimony did not violate

> Q. And from the statement given to you by Terry Roberts, were you able to identify all the participants . . .
> A. Yes, sir.
> Q. . . . in the robbery and in the murder?
> A. Yes, sir.
> Q. And who were they?
> A. It was Cedric Brown, Shawn Brown, Jamel Jenkins and Maurice Fleming.

Resp't's Ex. 15 at 1727. This was the first time petitioner's name was mentioned in Gray's testimony concerning his investigation.

7. Petitioner's main arguments on this issue imply that petitioner is concerned that the jury may have believed petitioner was involved in the robbery but not the killing, yet still found petitioner guilty of malice murder due to his association with Cedric Brown, the person petitioner alleges was the killer. As discussed more fully, *infra*, no reasonable juror would have interpreted the instructions as supporting such a finding.

8. The state court charged the jury on malice murder as follows:

> A person commits murder when he unlawfully and with malice aforethought either express or implied, causes the death of another human being.
> Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.
> Malice may be implied where no considerable provocation appears and where all

petitioner's Sixth Amendment Confrontation rights.

## C. Charges on Malice Murder, Parties to a Crime, and Conspiracy (Ground Three)

Petitioner asserts that the trial court violated his Fourteenth Amendment right to due process of law by issuing jury instructions on malice murder, parties to a crime and conspiracy which effectively relieved the state of its burden of proof on the essential elements of the offense.[7] Petitioner asserts that the malice murder charge[8] relieved the state of its burden on the element of intent because it failed to require the jury to find intent to kill, as opposed to simply finding malice, and because it failed to require the jury to find that petitioner himself had the intent to kill. Petitioner also alleges that the parties to a crime charge[9] relieved the state

> the circumstances of the killing show an abandoned and malignant heart.
> It is for you, members of the jury, to decide whether or not the facts and circumstances of this case show malice.
> It will be noted in the definition of murder with malice aforethought either express or implied. As the Code Section defines it, it is an essential ingredient and element of the offense of murder. [sic.] The burden is on the State of Georgia to show malice under these rules of law beyond a reasonable doubt.
> Now, legal malice is not ill will or hatred. It is the unlawful intent to kill or take the life of a human being without any justification or excuse. It must exist at the time of the killing. It is not necessary for the unlawful intent to take the life of a fellow creature to exist for any length of time before the killing. In our law a person may form the malicious intent to kill, do the killing instantly and regret the deed as soon as it is done.

Resp't's Ex. 16 at 1984–85.

9. The state court's instruction on parties to a crime is as follows:

> Now, members of the jury, the Court instructs you that every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime. A person is concerned in the commission of a crime only if he directly commits the crime or intentionally aids or abets in the commission of the crime.

of its burden of proof by failing to explain that petitioner could only be convicted of malice murder under the party to a crime theory if the jury found beyond a reasonable doubt that petitioner was a party to the crime of malice murder. Further, the charge allegedly failed to require that petitioner personally intended that the victim be killed. Finally, petitioner alleges that the conspiracy charge [10] relieved the state of its burden of proof because it failed to explain how the conspiracy charge applied to the malice murder count.

■■■■■ The Supreme Court has clearly established that the Fourteenth Amendment "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Francis v. Franklin*, 471 U.S. 307, 313, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Sandstrom v. Montana*, 442 U.S.

> I instruct you, members of the jury, that mere presence of a person at the scene of the commission of a crime at the time of its perpetration, without more, will not of itself authorize a jury to find the person who was merely present guilty of consenting or concurring in the commission of the crime, unless the evidence shows beyond a reasonable doubt that such person committed the alleged crime or that such person aided or abetted in the actual perpetration of the crime or participated in the criminal endeavor.
>
> I further instruct you that mere association by one with other persons involved in the commission of a crime, without more, will not of itself authorize a jury to find such person guilty of consenting or concurring in the commission of the crime, unless the evidence shows beyond a reasonable doubt that such person aided and abetted in the actual perpetration of the crime or participated in the criminal endeavor.
>
> Resp't's Ex. 16 at 1988–89.

10. The state court's charge on conspiracy is as follows:

> I instruct you that a conspiracy is an agreement between two or more persons to do an unlawful act, and the existence of a conspiracy may be established by proof of acts and conduct, as well as proof of an express agreement. Where persons associ-

510, 520–24, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Patterson v. New York*, 432 U.S. 197, 210, 215, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 698–701, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). An instruction that creates a mandatory presumption on an element of the offense is unconstitutional. *Francis*, 471 U.S. at 314, 105 S.Ct. 1965. However, an instruction that merely "suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion" is not constitutionally infirm. *Id.* The potentially offending portions of the instruction must be considered in the context of the charge as a whole, " 'for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction.' " *Id.* at 315, 105 S.Ct. 1965 (quoting *Sandstrom*, 442 U.S. at 514, 99 S.Ct. 2450).

> ate themselves in an unlawful enterprise any act done to further the unlawful enterprise by any party to the conspiracy is in legal contemplation the act of them all. However, each is responsible for the acts of others only insofar as such acts are naturally or necessarily done to further the conspiracy.
>
> Whether or not a conspiracy existed in this case is a matter that you, the jury, must determine. Presence, companionship and conduct before and after the commission of the alleged offense may be considered by you, the jury, in determining whether or not such circumstances, if any, give rise to an inference of the existence of a conspiracy.
>
> A person entering into a conspiracy already formed is a party to all acts done by the other conspirators before or after such entry in the furtherance of the criminal enterprise. If the existence of a conspiracy has been shown beyond a reasonable doubt by evidence other than by the declarations of any of the alleged co-conspirators, then any admissions or statements made by one or more of the conspirators during and in the furtherance of the alleged conspiracy may be considered by you, the jury, against all of them. However, if you do not find that a conspiracy existed, any such evidence by alleged co-conspirators, if any, should be disregarded and given no consideration in your deliberations.
>
> Resp't's Ex. 16 at 1982–83.

### 1. Malice Murder Charge

■ Petitioner asserts that the malice murder charge failed to require the jury to find intent to kill as well as malice and failed to require the jury to find that petitioner personally had an intent to kill. Specifically, petitioner argues that the "abandoned and malignant heart" portion of the instruction may have lead the jurors to believe that "it was sufficient to find petitioner guilty of malice murder simply because he participated in the robbery." Mem.Supp.Pet. Habeas Corpus at 36. That is, petitioner asserts that the portion of the instruction stating that malice may be inferred from an abandoned or malicious heart creates an unconstitutional presumption which shifts the burden of proof to the petitioner.

Petitioner's arguments are specious. The instruction, when read in context, clearly informed the jury that intent to kill is an element of malice under Georgia law. Resp't's Ex. 16 at 1984. *See Francis,* 471 U.S. at 320, 105 S.Ct. 1965 (stating that, under Georgia law, malice aforethought consists of two elements: intent and the absence of provocation); *Lamb v. Jernigan,* 683 F.2d 1332, 1337 (11th Cir.1982) (holding that malice under Georgia law consists of intent to kill and lack of provocation or justification). Consequently, to find the existence of malice, the jury must also find the existence of intent to kill. The jury instructions clearly set forth this principle of law for the jury. Resp't's Ex. 16 at 1984–85 ("Now, legal malice is not ill will or hatred. It is the unlawful intent to kill or take the life of a human being without any justification or excuse."). Accordingly, the instruction did not fail to explain to the jury that intent to kill is a necessary element of the offense.

■ Furthermore, the "abandoned and malignant" heart instruction[11] does not create an unconstitutional mandatory presumption of intent. This language, like the language in *Lamb v. Jernigan,* "is

really a directive to the jury that the finding of malice must often be based entirely on circumstantial evidence—that it is not entitled to refuse to find malice solely because direct evidence of malicious intent is lacking." *Lamb,* 683 F.2d at 1340. Thus, this instruction merely informs the jury that they are permitted to infer malice from the circumstances surrounding the commission of the offense, but they are not required to so infer. *Francis,* 471 U.S. at 314, 105 S.Ct. 1965. As such, the instruction does not create an unconstitutional mandatory presumption on the element of intent.

■ Finally, the jury, after hearing the instruction in context, would not reasonably have believed that they could find petitioner guilty of malice murder solely based on his participation in the robbery. The court clearly instructed the jury that malice murder requires that petitioner cause the death of another human being. Resp't's Ex. 16 at 1984 ("A person commits murder when he unlawfully and with malice aforethought either express or implied, causes the death of another human being."). Mere participation in the robbery could not reasonably be construed as "causing the death of" Mr. Hodges. Furthermore, although the phrase "abandoned and malignant heart" is not clearly defined, the context of the instruction clearly indicates its meaning. Indeed, as the Eleventh Circuit has already found, the "abandoned and malignant heart" instruction requires that "before drawing an inference of malice, the trier of fact must first conclude that the facts surrounding the killing indicate that the defendant acted with a 'malignant heart.'" *Lamb,* 683 F.2d at 1340. The instruction does not, however, relieve the jury of the duty of finding that a killing occurred and that petitioner participated in the killing. The instruction merely informs the jury that they may infer intent to kill from the

---

11. This portion of the instruction reads: "Malice may be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." Resp't's Ex. 16 at 1984.

circumstances surrounding the killing, an inference permitted by the Constitution under the rationale of *Lamb v. Jernigan*. Consequently, the malice murder instruction did not violate petitioner's Fourteenth Amendment due process rights.

### 2. Parties to a Crime Charge

■ Petitioner asserts that the parties to a crime charge was defective because the jury could reasonably have believed that they could convict petitioner of malice murder if they found him to be a party to the crime of armed robbery. Petitioner further alleges that the charge was erroneous for failing to explain that the jury had to find that petitioner personally intended that Mr. Hodges be killed. Mem.Supp. Pet. Habeas Corpus at 38. Petitioner's arguments are baseless.

No reasonable juror would have understood the instruction to have the meaning petitioner asserts here. The court instructed the jury that all persons concerned in the commission of a crime are parties thereto. The court went on to state that "[a] person is concerned in the commission of *a* crime only if he directly commits *the* crime or *intentionally* aids or abets in the commission of *the* crime." Resp't's Ex. 16 at 1988 (emphasis added). Reading this instruction in light of the ordinary rules of grammar, in order for a person to be concerned in the commission of a crime (here malice murder), the person must directly commit that crime (malice murder) or intentionally aid or abet in the commission of that crime (again malice murder). Consequently, no reasonable juror would have believed the instruction authorized a conviction for malice murder if the jury merely found petitioner to be a party to the crime of armed robbery.

Furthermore, the instruction clearly requires that the jury find that petitioner intended to aid and abet in the commission of the crime (here malice murder). To

find that petitioner intended to aid and abet in the commission of malice murder is equivalent to a finding that petitioner intended that Mr. Hodges be killed. Coupled with the malice murder instruction analyzed above, which also clearly requires intent to kill, the jury was sufficiently instructed on the element of intent. Accordingly, the parties to a crime instruction did not violate petitioner's Fourteenth Amendment rights.

### 3. Conspiracy Charge

■ Petitioner asserts that the conspiracy charge was erroneous because it failed to explain how the law of conspiracy applied to the malice murder count of the indictment. Essentially, petitioner claims that the instruction created the mistaken impression that the jury could find petitioner guilty of malice murder if he conspired with anyone for any purpose. Again, petitioner's arguments are baseless. The conspiracy instruction was given at the end of the segment of instructions concerning witness credibility, impeachment of witnesses, statements elicited by custodial interrogation, and the weight the jury should give statements allegedly made by defendant. Resp't's Ex. 16 at 1975–83. Furthermore, unlike the parties to a crime instruction, the conspiracy charge was not given as part of the substantive law section of the instructions.[12] The placement of the instruction plus the actual text thereof clearly indicates that this instruction was only given so that the jury could determine whether to consider hearsay statements made by some of the alleged co-conspirators. In light of the clear and unambiguous substantive instructions that followed, no reasonable juror would have believed that the jury could find petitioner guilty of malice murder if he merely conspired to rob Mr. Hodges. Consequently, the conspiracy charge did

---

12. The conspiracy charge is given at pages 1982–83 of the trial transcript. Resp't's Ex. 16 at 1982–83. The substantive law section begins on page 1984 of the trial transcript.

Resp't's Ex. 16 at 1984. The parties to a crime charge is found at pages 1988–89 of the transcript. Resp't's Ex. 16 at 1988–89.

not violate petitioner's Fourteenth Amendment due process rights.

### D. Sufficiency of Corroboration Evidence (Ground Four) and Failure to Charge that Accomplice Testimony must be Corroborated (Ground Eleven)

 Petitioner alleges in ground four that the trial court violated petitioner's Sixth and Fourteenth Amendment rights by failing to submit the issue of the sufficiency of the corroboration evidence to the jury. He further alleges in ground eleven that the trial court violated his Sixth Amendment rights by failing to charge the jury that accomplice testimony must be corroborated. Georgia law provides that a person may not be convicted of a felony based solely upon the uncorroborated testimony of an accomplice. O.C.G.A. § 24–4–8. The sufficiency of the corroboration testimony is a matter which must be determined by the jury. *Bradford v. State*, 261 Ga. 833, 412 S.E.2d 534, 535 (1992). However, Section 24–4–8 does not apply where the state does not rely solely on the testimony of a single accomplice. *Ross v. State*, 245 Ga. 173, 263 S.E.2d 913, 916 (1980); *Hall v. State*, 241 Ga. 252, 244 S.E.2d 833, 838 (1978); *Belcher v. State*, 207 Ga.App. 117, 427 S.E.2d 88, 90 (1993); *Smith v. State*, 205 Ga.App. 810, 424 S.E.2d 56, 59 (1992).

 The Supreme Court has clearly established a constitutional right to have all the factual issues necessary for a determination of guilt determined by a jury. *Sullivan v. Louisiana*, 508 U.S. 275, 277–78, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Under Georgia law, the sufficiency of corroboration evidence would be such a factual issue if the state relies solely on the testimony of a single accomplice. The Georgia Supreme Court found that the state did not rely solely on Terry Roberts's testimony in this case but also relied on defendant's statements admitting his participation in the crime. *Jenkins II*, 491 S.E.2d at 59. Petitioner asserts that this finding was erroneous because the statements standing alone were not sufficient to

establish petitioner's guilt. Mem.Supp. Pet. Habeas Corpus at 46. The Georgia Supreme Court, however, determined that these statements were sufficient under Georgia law to trigger the rule of *Hall v. State*. It is not the province of this Court to reexamine state-court determinations of state-law questions. *Estelle v. McGuire*, 502 U.S. 62, 67–78, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Accordingly, the Court must defer to the state court's interpretation of state law. Because the state relied on evidence other than the accomplice's testimony, the trial court was not required to submit the sufficiency of corroboration evidence to the jury and was therefore not required to charge the jury on corroboration. Consequently, there was no violation of petitioner's Sixth and Fourteenth Amendment rights with respect to these two grounds.

### E. Sufficiency of the Evidence (Ground Five)

 Petitioner alleges that the trial court violated his Fourteenth Amendment right to due process of law because the evidence submitted at trial was insufficient to convict him of malice murder beyond a reasonable doubt. The Supreme Court has clearly established that due process requires that no person shall convicted except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A federal court reviewing an alleged due process violation of this type must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781.

 Georgia law on malice murder requires proof beyond a reasonable doubt that petitioner caused Hodges's death with malice aforethought. O.C.G.A. § 16–5–1(a). Malice consists of intent to kill and lack of provocation or justification. *Lamb*, 683

F.2d at 1337. Petitioner asserts that the evidence was insufficient to prove beyond a reasonable doubt that petitioner personally killed Mr. Hodges or that he aided and abetted Cedric Brown in the murder of Mr. Hodges. Nevertheless, petitioner concedes that "there was some evidence ... that petitioner also shot Mr. Hodges." Mem.Supp.Pet. Habeas Corpus at 49, 51.

Further, petitioner concedes that a shell casing and bullet fired from a .25 caliber pistol other than the one allegedly used by Cedric Brown was found at the scene. *Id.* at 49. The state's expert witness established that this shell casing and bullet were fired from a Lorcin .25 caliber pistol, the type of gun Terry Roberts testified petitioner carried into the store on the afternoon of the robbery. Resp't's Ex. 16 at 1870–74 (testimony of ballistics expert Kelly Fite); Resp't's Ex. 15 at 1670–72, 1690 (testimony of Terry Roberts stating that petitioner possessed a handgun given to him by Maurice Fleming on the day of the murder); *Id.* at 1739–41 (testimony of Roger Fleming stating that his .25 caliber Lorcin pistol disappeared from his home immediately after a visit from Maurice Fleming). The Lorcin bullet, found near the desk area where the shooting began, did not sustain much damage. *Id.* at 1634.

Additionally, the medical examiner established that Mr. Hodges suffered five wounds, one of which was definitely fatal and a second which was potentially fatal. *Id.* at 1624, 1627–28. The bullet which caused the fatal wound was never recovered, but the medical examiner testified that the bullet which caused that wound would not have suffered much damage in that its trajectory was largely through soft body tissue. *Id.* at 1628, 1634–35.

The state also produced testimony that petitioner made several incriminating statements concerning his role in the robbery. Terry Roberts, the driver of the "get away car," testified that immediately after the robbery, petitioner stated, "Yeah, yeah, yeah, I got him, bang, bang." *Id.* at 1669. Roberts also testified that petitioner and Cedric Brown were joking about the shooting, about police initially arresting someone else, and about their plans to flee to Florida. *Id.* at 1676–77, 1688–89. James Smith, a police officer with the city of Opalocka, Florida, testified that petitioner volunteered a statement to him after petitioner's arrest in Florida. Specifically, he testified that petitioner was worried about the electric chair and stated "I only shot him once." *Id.* at 1775–76. Finally, Kenneth McCall, a former cellmate of petitioner, testified that petitioner told McCall that he shot Mr. Hodges, whom petitioner allegedly referred to as the "Old Cracker," twice and that he was the first person to shoot Hodges. *Id.* at 1844.

Viewing this evidence in the light most favorable to the prosecution, a reasonable jury could have found petitioner guilty of malice murder beyond a reasonable doubt. It was reasonable for the jury to infer from this testimony that petitioner shot Mr. Hodges at least once and that this shot was either the fatal shot or it enabled Cedric Brown to fire the fatal shot by wounding Mr. Hodges or otherwise impeding his escape. Accordingly, there was sufficient evidence to convict petitioner of malice murder, and the trial court did not violate petitioner's Fourteenth Amendment rights by submitting the case to the jury.

### F. Exclusion of Evidence at the Guilt Phase of the Trial (Ground Six)

■ Petitioner's sixth ground alleges that the trial court violated his right to due process of law by improperly excluding evidence in the guilt phase of his trial. Specifically, petitioner alleges that the court's exclusion of Cedric Brown's guilty plea and any statements made at the plea hearing as well as Brown's mental health file denied petitioner the right to present reliable material evidence in his defense.

■ The Supreme Court has established that criminal defendants have the constitutional right to present a defense, including the right to offer testimony and evidence in their defense. *Chambers v.*

*Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Webb v. Texas,* 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *Washington v. Texas,* 388 ·U.S. 14, 18–19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). However, the Supreme Court has never clearly established bright-line rules concerning particular types of evidence. Rather, the Supreme Court has established that the central issue is whether the state court's evidentiary rulings deprive the defendant of a fair trial under the facts and circumstances of the particular case. *Chambers,* 410 U.S. at 303, 93 S.Ct. 1038.

Consequently, criminal defendants "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence," unless the application of those rules under the circumstances of the case would deprive defendant of a fair trial. *Id.* at 302, 93 S.Ct. 1038. Petitioner has failed to establish how the exclusion of Brown's guilty plea, statements at his plea hearing, and mental health file deprived petitioner of a fair trial. Because the evidence clearly indicates that two different shooters were involved in the murder, Brown's guilty plea alone does not exculpate petitioner. Furthermore, there is no evidence that Brown made any statements at his plea hearing tending to exonerate petitioner. Therefore, the trial court's finding that this evidence was irrelevant did not deprive petitioner of a fair trial. Finally, the state court found that petitioner only sought Brown's mental health records for impeachment purposes and held that since Brown did not testify, petitioner's appeal on this issue was moot. *Jenkins II,* 491 S.E.2d at 58 n. 3. Petitioner has failed to present clear and convincing evidence that this factual finding is incorrect. 28 U.S.C. § 2254(e)(1). Accordingly, the Court finds that the trial court did not violate petitioner's right to due process of law by excluding this evidence from the guilt phase of petitioner's trial.

## G. False and Misleading Testimony by State's Witnesses (Ground Seven)

Petitioner's seventh ground raises another alleged due process violation: that the state failed to correct the false or misleading testimony of three of its witnesses: Keith Moran, Kenneth McCall and Thomas Howard. Specifically, petitioner asserts that Moran's testimony falsely implied that Roberts could not be charged with murder, thus enhancing Roberts's credibility, and implied that petitioner was aware of a plot to kill Mr. Hodges prior to the robbery. Also, petitioner claims that McCall and Howard falsely testified that McCall received no deals or promises of leniency in exchange for his testimony.

The Supreme Court has clearly established that a· conviction obtained via evidence, known by the state to be false, violates the Fourteenth Amendment. *Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Falsehoods about the credibility of a witness also violate due process. *Napue,* 360 U.S. at 269, 79 S.Ct. 1173. However, a new trial is required only if the false testimony could in any reasonable likelihood have affected the judgment of the jury. *Giglio,* 405 U.S. at 154, 92 S.Ct. 763; *Napue,* 360 U.S. at 271, 79 S.Ct. 1173.

Petitioner asserts that Moran's testimony essentially stated that Terry Roberts could not be charged with the murder or felony murder of Mr. Hodges. Mem.Supp. Pet. Habeas Corpus at 55. He further alleges that the testimony implies that Moran's "investigation must have developed some evidence that petitioner was aware of a plan to kill Mr. Hodges prior to the time that it occurred." *Id.* As the Georgia Supreme Court found, Moran's testimony, when read in context, neither stated nor implied any such thing.[13] *Jenkins II,* 491 S.E.2d at 57. Petitioner has failed to present any clear and convincing

---

**13.** The portion of Moran's testimony at issue is as follows:

Q. Mr. Moran, as to Terry Roberts, as— initially, as certain warrants were issued in

evidence that this factual finding is incorrect. 28 U.S.C. § 2254(e)(1). Accordingly, the Court finds that Moran's testimony was not false, and petitioner's Fourteenth Amendment rights were not violated by the prosecution's failure to correct the testimony.

Petitioner argues that Kenneth McCall and Charles Howard falsely testified that McCall was offered no deals or promises of leniency in exchange for his testimony. Petitioner contends that McCall was in fact rewarded for his testimony by the District Attorney through a "nice letter" written to the parole board on McCall's behalf and through the dismissal

of certain habitual violator charges over a year after the end of petitioner's trial. Mem.Supp.Pet. Habeas Corpus at 56–57. The Georgia Supreme Court found that the dismissal of the habitual violator charges was not part of a deal for McCall's testimony. *Jenkins II*, 491 S.E.2d at 57–58. Petitioner has provided no clear and convincing evidence that this factual finding is incorrect.[14] 28 U.S.C. § 2254(e)(1). Furthermore, there is no evidence in the record that McCall was ever told of the District Attorney's practice of writing a letter to the pardon and parole board on behalf of inmates who testify on behalf of the state.[15] It is axiomatic that there can be no deal in exchange for testimony if the

> the case there was a[sic] initial warrant issued against Terry Roberts for murder, along with the other individuals involved, is that correct?
> A. That's correct.
> Q. Okay. During that time and after that time, when the investigation was ongoing, had you consulted with the DA's Office . . .
> A. Yes, sir.
> Q. . . . concerning all the warrants?
> A. Yes, sir.
> Q. And when the investigation got completed had y'all developed any information to indicate that Mr. Roberts was aware of any plan to kill Mr. Hodges, prior to the time that it occurred?
> A. No, sir. No information that he knew that they had—that Mr. Roberts—or Mr. Hodges was gonna be shot.
> Q. But no information that he was aware that—that there was going to be a murder . . .
> A. No.
> Q. . . . prior to it happening.
> A. Right.
> Q. Okay. The decision to dismiss that murder warrant against him was made by, who?
> A. By your office, sir.
> Q. Okay.
> Resp't's Ex. 15 at 1840–41. The inferences urged by petitioner are a stretch, to say the least. The only reasonable inferences that may be drawn from this testimony are that Roberts was not aware that Hodges would be killed when he drove petitioner and the others to the store, and that the district attorney's office, for reasons of its own, ultimately dismissed the murder warrant against Roberts. The testimony never purports to address Roberts's culpability for felony murder, nor does it ever address the existence of, or petitioner's knowledge of, any plan to kill Hodges before

> it happened. Indeed, the prosecution never argued that such a plan existed, relying instead on the theory that petitioner and the others planned to rob Hodges and that petitioner and Cedric Brown decided to shoot Hodges in order to facilitate the robbery. Resp't's Ex. 16 at 1939 ("Clevon Jamel Jenkins went into that store, shot Mr. Bobby Hodges so they could take money."); *id.* at 1940 ("You can form that intent [to kill] five minutes before you do it. You don't have to plan it for three days."); *id.* ("The State contends the evidence is clear that they went in there with one intent and one intent only, to shoot Mr. Bobby Hodges and take his money.").

**14.** Indeed, the very colloquy between the district attorney and the judge in McCall's case supports the state court's finding. It is clear that the dismissal of the charges occurred because the time limit on McCall's speedy trial demand had run, and not because the District Attorney was attempting to fulfill his end of a deal with McCall. Mem.Supp.Pet. Habeas Corpus at 57 (quoting colloquy between District Attorney Cheney and Judge Rahn in McCall's habitual violator case).

**15.** Petitioner's entire argument is based on the timing of the testimony vis-a-vis the mailing of the letter to the parole board. Mem. Supp.Pet. Habeas Corpus at 56 n. 26 and accompanying text. Timing alone is not enough for the Court to conclude that an agreement for testimony existed. *McCleskey v. Kemp*, 753 F.2d 877, 884 (11th Cir.1985) ("In the absence of any other evidence, the Court cannot conclude an agreement existed merely because of the subsequent disposition of criminal charges against a witness for the

District Attorney never communicated his intentions to the witness prior to the giving of the testimony. Accordingly, the Court finds that the testimony of McCall and Howard was not false, and petitioner's Fourteenth Amendment rights were not violated by the prosecution's failure to correct the testimony.

### H. *Brady* Violation (Ground Eight)

██ Petitioner argues in his eighth ground that his Fourteenth Amendment rights were violated by the prosecutor's failure to disclose alleged exculpatory evidence pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, petitioner alleges that the prosecution failed to disclose the existence of additional criminal charges against Kenneth McCall which were pending at the time of trial.[16]

 The Supreme Court has clearly established that prosecutorial suppression of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194 (1963). This rule applies to impeachment evidence as well as exculpatory evidence. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

> To establish a *Brady* violation a defendant must prove the following: (1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable prob-

ability exists that the outcome of the proceedings would have been different. *United States v. Meros,* 866 F.2d 1304, 1308 (11th Cir.1989) (internal citations omitted). *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("[S]howing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, *which alone can know what is undisclosed,* must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached.") (emphasis added); *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375 (holding that material evidence must be disclosed if there exists a reasonable probability that had the evidence been disclosed, the trial would have been different).

The Georgia Supreme Court held that because the charges were a matter of public record and because McCall admitted the existence of the habitual violator charges on cross-examination, no *Brady* violation existed. *Jenkins II,* 491 S.E.2d at 58; *see also* Resp't's Ex. 15 at 1847 (testimony of Kenneth McCall). Petitioner has not shown that this finding was an unreasonable application of relevant Supreme Court authority. *Williams,* 120 S.Ct. at 1523. "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one...." *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). *Brady* and its progeny only require the prosecution to disclose material information known only to the prosecution. Because McCall's criminal record was a matter of public knowledge, the prosecution had no duty to

State."). Furthermore, when the alleged promise offers marginal benefit to the witness, it is doubtful that such a promise would motivate a reluctant witness to tailor his testimony to please the prosecutor. *Id.* Consequently, even if McCall had been told of the District Attorney's intention to write a "nice letter" to the pardon and parole board, such a promise would not be the type required to be disclosed under *Giglio* and *Napue. Id.*

**16.** McCall was an inmate to whom petitioner allegedly made a "jailhouse confession." Many of McCall's charges were made known to petitioner. However, the existence of a habitual violator charge pending in a different county was not disclosed prior to trial. This county was also under the control of the District Attorney prosecuting petitioner. Mem. Supp.Pet. Habeas Corpus at 59–60; *Jenkins II,* 491 S.E.2d at 57–58.

disclose it under *Brady*. *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555; *Meros*, 866 F.2d at 1304. Consequently, petitioner's due process rights were not violated by the failure to disclose McCall's pending habitual violator charge to the defense.

### I. Improper Admission of Hearsay—Testimony of Investigator Gray (Ground Nine)

Petitioner contends that the trial court violated his Sixth Amendment confrontation rights by admitting hearsay testimony by Investigator Gray concerning statements made by Terry Roberts, Shawn Brown, and Roger Fleming.[17] Further, petitioner asserts that the admission of these statements violated the Constitution even though Mr. Roberts and Mr. Fleming testified later at trial. Mem.Supp.Pet. Habeas Corpus at 64.

■■■ Petitioner's arguments have no merit. The Supreme Court has clearly established that hearsay statements may be admissible against a criminal defendant if certain requirements are met. *Idaho v. Wright*, 497 U.S. at 814–15, 110 S.Ct. 3139 (holding that hearsay statements may be admitted if declarant is unavailable and there are certain indicia of reliability present). The Court has further held that hearsay statements made by persons who later testify at trial do not violate the Confrontation Clause. *Ohio v. Roberts*, 448 U.S. at 65, 100 S.Ct. 2531 ("In the usual case (including cases where prior cross-examination has occurred), the prosecution *must either produce*, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.") (emphasis added); *California v. Green*, 399 U.S. at 162, 90 S.Ct. 1930 ("For where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem."). Consequently, petitioner's Confrontation Clause rights were not violated by the admission of statements made by Terry Roberts and Roger Fleming.

■■■ With respect to Gray's testimony concerning statements by Shawn Brown, the Georgia Supreme Court found this testimony to be cumulative of properly admitted testimony. *Jenkins II*, 491 S.E.2d at 57. Petitioner has failed to present clear and convincing evidence that this factual finding is incorrect and has failed to show that this finding is an unreasonable application of Supreme Court precedent. 28 U.S.C. § 2254(e)(1); *Williams*, 120 S.Ct. at 1523. The Supreme Court has held that habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Petitioner has failed to establish any actual prejudice that occurred as a result of the trial court's admission of hearsay statements that were wholly duplicative of the admissible testimony of Terry Roberts and other trial witnesses.[18] Accordingly, the Court finds that petitioner's Sixth Amendment rights were not violated by the admission of hearsay statements in Investigator Gray's testimony.

### J. Improper Admission of Hearsay Testimony—Testimony as to Co-Conspirators' Statements (Ground Ten)

Petitioner alleges that the trial court violated his Sixth Amendment confronta-

---

**17.** Petitioner also attacks the admissibility of Gray's testimony as to information received from silent witnesses. That argument is addressed in part B, *supra*.

**18.** Gray testified that he obtained information from Shawn Brown on petitioner's flight to Florida as well as the location of Roberts's car as the robbery was in progress and the fact that two weapons were used in the crime. Resp't's Ex. 15 at 1729–33. Roberts testified to all of this from his own personal knowledge on direct examination. Resp't's Ex. 15 at 1662–65 (location of car during robbery); *id.* at 1669–72 (use of two guns); *id.* at 1675–78 (flight of petitioner, Cedric Brown, and Maurice Fleming to Miami).

tion rights by erroneously admitting hearsay statements during the testimony of Terry Roberts. Specifically, petitioner argues that the statements by Cedric Brown and Maurice Fleming were not admissible under the co-conspirator exception because the court failed to find that the state had established a prima facie case of conspiracy prior to admitting the evidence and because the court failed to make a finding on the reliability of the statements. Mem. Supp.Pet. Habeas Corpus at 65–69.

 Petitioner's first argument is not one of constitutional law. Rather, it is an argument that the state court failed to follow state law by admitting the statements before making a finding that a prima facie case of conspiracy had been proven. Petitioner's reading of state law is erroneous. Georgia allows the admission of testimony by co-conspirators before the conspiracy has been proven, provided its existence is ultimately shown at trial. *Waldrip v. State*, 267 Ga. 739, 482 S.E.2d 299, 309 (1997). Accordingly, the court did not err by admitting the testimony before ruling on whether a prima facie case of conspiracy had been proven. Furthermore, the court did rule that a prima facie case of conspiracy was established. Resp't's Ex. 16 at 1881. The Georgia Supreme Court found that the facts supported the trial court's ruling. *Jenkins II,*

491 S.E.2d at 58. Petitioner has failed to present clear and convincing evidence that this factual finding was incorrect.[19] 28 U.S.C. § 2254(e)(1).

 Petitioner provides no support for his assertion that the **trial court** must examine the hearsay statements for indicia of reliability under *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). Indeed, in *Dutton* itself, there is no evidence that the trial court made a finding that "indicia of reliability" existed. Rather, such a finding was made by the Supreme Court when it ruled that no confrontation violation occurred as a result of the admission of the hearsay statements. *Id.* at 73–74, 91 S.Ct. 210. Consequently, the trial court's failure to address the existence of indicia of reliability was not error. The Georgia Supreme Court found that sufficient indicia of reliability existed, and petitioner has failed to establish that this finding was contrary to or was an unreasonable application of clearly established Supreme Court precedent.[20] *Williams,* 120 S.Ct. at 1523. Accordingly, the Court finds that the trial court did not violate petitioner's Sixth Amendment rights by admitting the testimony of Terry Roberts as to hearsay statements made by the co-conspirators.

19. Petitioner asserts without any legal support that the state could not establish a prima facie case of conspiracy based solely on the testimony of Terry Roberts because that testimony had to be corroborated. Mem.Supp. Pet. Habeas Corpus at 66. This Court already found that no corroboration of Roberts's testimony was necessary under Georgia law. *See supra* part D. The evidence provided by Roberts as well as petitioner's own statements to law enforcement and others supported the finding that a conspiracy existed. Accordingly, petitioner's arguments do not amount to "clear and convincing evidence" that the Georgia Supreme Court's factual finding was erroneous.

20. Petitioner's sole argument that no indicia of reliability existed was Terry Roberts's admissions that he lied to the police the first few times he spoke with them. Mem.Supp.Pet. Habeas Corpus at 68. However, the indicia

of reliability referred to by the Supreme Court in *Dutton* have nothing to do with the credibility of the testifying witness. Rather, the indicia of reliability relied upon by the Supreme Court have to do with knowledge of the **declarant**, whether the **declarant** was proceeding on faulty recollection, and whether the **declarant** had reason to lie. *Dutton*, 400 U.S. at 88–89, 91 S.Ct. 210. The declarants, Cedric Brown and Maurice Fleming, were participants in the robbery. Both went inside the store. All statements made by the two were made either immediately before or immediately after the robbery and murder, and there's no evidence that either had reason to lie to Terry Roberts under the circumstances. Resp't's Ex. 15 at 1659, 1666–69. Accordingly, the Georgia Supreme Court's finding that sufficient indicia of reliability existed is not an unreasonable application of Supreme Court precedent.

## K. Improper Admission of Petitioner's Statement to Officer Smith (Ground Twelve)

Petitioner alleges in his twelfth ground that the trial court violated his Fifth Amendment privilege against self-incrimination by admitting a coerced confession. Specifically, he asserts that the evidence at trial showed that statements he made to Officer James Smith were not spontaneous, as found by the trial court in a pretrial *Jackson–Denno* hearing.[21] Consequently, petitioner argues that the trial court erred by admitting those statements without reopening the *Jackson–Denno* hearing. Mem.Supp.Pet. Habeas Corpus at 72–73.

At the pretrial hearing, Officer Smith testified that petitioner spontaneously stated "I only shot him once." Mem.Supp.Pet. Habeas Corpus at 72. Petitioner asserts that at trial, Officer Smith testified that he told petitioner "to tell the truth" and "to get your life together" before petitioner made his statement. Petitioner alleges that these comments by Officer Smith, if made before petitioner's statement, constitute custodial interrogation which requires a new *Jackson–Denno* hearing. *Id.* at 73–74. Reviewing Smith's trial testimony as a whole, it is obvious that Smith did not testify in the manner asserted by petitioner. At one point during cross-examination, Smith appears to state that petitioner's statement was made after Smith's comments about getting his life together.[22] However, upon further questioning, Smith clearly indicated that petitioner's statement was made before any such comments by Smith.[23]

The Georgia Supreme Court also found that the totality of Officer Smith's testimony did not support petitioner's argument. *Jenkins II*, 491 S.E.2d at 58. Petitioner has failed to establish that this ruling was contrary to or was an unreasonable application of clearly established Supreme Court precedent. *Williams*, 120 S.Ct. at 1523. Accordingly, the Court finds that the trial court did not violate petitioner's Fifth Amendment rights by admitting the testimony of Officer Smith.

## L. Ineffective Assistance of Counsel (Ground Thirteen)

▮▮▮▮▮ Petitioner alleges in ground thirteen that he was denied his Sixth Amendment right to effective assistance of counsel due to numerous alleged errors made by his trial counsel. The Supreme Court has clearly established that criminal defendants have a Sixth Amendment right to "reasonably effective" legal assistance. *Roe v. Flores–Ortega*, ── U.S. ──, ──, 120 S.Ct. 1029, 1034, 145 L.Ed.2d 985 (2000); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish a violation of this Sixth Amendment right, petitioner must show (1) that counsel's representation fell

---

21. The pre-trial ruling was upheld on interim appeal by the Georgia Supreme Court. *Jenkins I*, 265 Ga. 539, 458 S.E.2d 477 (1995).

22. The testimony in question is as follows:
 Q. ... And at what point in time did Mr. Jenkins say, "I only shot him once"?
 A. We was [sic] on Palm Road, I believe we were passing 58th Street.
 Q. And he just blurted out with it?
 A. Just—just said it.
 Q. Okay. And you had already talked to him about getting his life together, hadn't you?
 A. Yes.
 Resp't's Ex. 15 at 1786–87.

23. "Q. ... You had already told him to tell the truth about it, hadn't you? A. *When he told me what he said*, I said, 'Man, just tell the

truth. Whatever happened, tell the people the truth.'" Resp't's Ex. 15 at 1787 (emphasis added). "Q. And after that [Officer Smith's statement about telling the truth] is when he said, 'Well, I only shot him once.' A. No, I don't think it was during that period. *But we were just sitting up there riding and when he made the statement*, I was like looking straight ahead." *Id.* "Okay. To be perfectly clear, the statement you made to him about, 'You need to go ahead and tell the truth,' was that made by you before or after he made the statement, 'I only shot him once'? A. After." *Id.* at 1804. "Q. But you didn't say that [the statement about getting his life together] before he made his little ... quip? A. No." *Id.* at 1805.

below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant. *Flores–Ortega*, 120 S.Ct. at 1034; *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. 2052. Both parts of the test must be satisfied in order to show a violation of the Sixth Amendment. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

 With respect to the first prong, the Court must respect counsel's tactical decisions if they seem reasonable considering all the circumstances. *Id.* at 688, 104 S.Ct. 2052. Consequently, great deference is given to counsel's choices and every effort must be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. 2052. Ultimately, to prevail on *Strickland*'s first prong, petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). To satisfy *Strickland*'s second prong, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Petitioner lists sixteen alleged errors. Seven of these alleged errors involve the failure to object to events at trial which this Court has already found did not violate petitioner's constitutional rights.[24] Consequently, petitioner cannot establish that his attorneys' failure to object to these events prejudiced his defense. *Johnston v. Singletary*, 162 F.3d 630, 644 (11th Cir.1998) (finding that no prejudice exists when counsel fails to timely object to conduct by prosecutor and court which did not violate Constitution or Supreme Court precedent). Accordingly, the Court will address in detail only those items which have not previously been addressed in this Order.

### 1. Improperly Advising Petitioner not to Testify

 Petitioner claims his attorneys misled him regarding the probable outcome of the case and improperly advised him not to testify in his own defense. Mem.Supp.Pet. Habeas Corpus at 76–78. Petitioner concedes that ordinarily this is a question of trial strategy, but he contends that under the facts of this case, counsel were constitutionally deficient in misleading petitioner as to the status of the case and failing to have petitioner testify. *Id.* at 77. Petitioner has failed to overcome the presumption that these actions were a matter of trial strategy. First, viewing the trial from counsel's point of view at the time, it was not obvious that the trial was

**24.** These alleged errors are as follows: (1) Failure to object to improper hearsay testimony provided by unidentified silent witnesses, Mem.Supp.Pet. Habeas Corpus at 82—testimony found proper, *supra*, Part B; (2) failure to object to erroneous jury instructions on the issues of malice, parties to a crime, and conspiracy, Mem.Supp.Pet. Habeas Corpus at 82–83—instructions found proper, *supra*, Part C; (3) failure to request an instruction on the issue of corroboration and failure to object to the court's charge which omitted such an instruction, Mem.Supp.Pet. Habeas Corpus at 83–84—instruction found proper, *supra*, Part D; (4) failure to object to, or correct, the false testimony provided by Deputy Moran, Mem.Supp.Pet. Habeas Corpus at 84–85—testimony found not false, *supra*, Part G; (5) failure to object to hearsay during the testimony of Investigator Gray, Mem.Supp.Pet. Habeas Corpus at 85—admission of testimony found not to be error, *supra*, Part I; (6) failure to object to conspiracy charge on the ground that it failed to inform the jury that a co-conspirator's testimony regarding the existence of a conspiracy must be corroborated, Mem.Supp.Pet. Habeas Corpus at 86–87—charge found proper, *supra*, Part D; and (7) failure to object to the admission of co-conspirator statements on the ground that the state had failed to prove, and the court had failed to determine, whether a prima facie case of conspiracy existed, Mem.Supp.Pet. Habeas Corpus at 99–100—admission of statements found proper, *supra*, Part J.

going to result as it did. Viewing the trial as a whole, petitioner's counsel very effectively and thoroughly cross-examined the state's most important witnesses and managed to clearly present their alternate theory of how the robbery and murder occurred. Their failure to accurately predict which theory the jury would believe and their concomitant optimism when discussing the case with petitioner do not amount to ineffective assistance of counsel.

Second, petitioner has failed to establish that his attorneys' advice against testifying was anything other than reasonable trial strategy. At the hearing in support of petitioner's motion for a new trial, his trial counsel testified that after listening to petitioner's version of the robbery and murder, they did not hear anything that would help the defense and they were afraid petitioner might say something on cross examination that would be detrimental to his defense. *Id.* at 78. "In order to show that an attorney's strategic choice was unreasonable, a petitioner must establish that no competent counsel would have made such a choice." *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998). Petitioner has failed to make such a showing. Accordingly, the Court finds that petitioner's trial counsel were not deficient for advising petitioner not to testify.

### 2. Failing to Impeach Terry Roberts with his Prior Inconsistent Statements

Petitioner contends that trial counsel's failure to use Roberts's actual prior statements to impeach him "was grossly deficient and highly prejudicial and deprived petitioner of effective assistance of counsel." Mem.Supp.Pet. Habeas Corpus at 80. Roberts testified on direct and on cross examination that he lied to police the first few times he spoke with them to protect himself and his cousin Maurice Fleming. Resp't's Ex. 15 at 1682, 1686–87. Furthermore, throughout the cross-examination of Terry Roberts, petitioner's counsel repeatedly emphasized the relationship between Roberts and Fleming, Fleming's extensive role in the robbery, and how

Fleming was already in trouble with the law at the time of the robbery. *Id.* at 1684–1701. There is no reasonable probability that introduction of Roberts's actual statements to the police would have damaged his credibility any more than the highly effective cross-examination did. Accordingly, even if failure to introduce the actual statements was error, petitioner has failed to establish that this alleged error prejudiced his defense in any way.

### 3. Failure to Introduce Evidence Showing that Cedric Brown was Mentally Retarded

Petitioner alleges that his trial counsel were ineffective for failing to introduce evidence showing that Cedric Brown was mentally retarded. Mem.Supp.Pet. Habeas Corpus at 80–82. It is clear from counsel's closing argument at trial that their theory of the case was that Cedric Brown, and to a lesser extent Maurice Fleming, were the masterminds behind the robbery and shooting. Resp't's Ex. 16 at 1949–50 ("Terry Roberts talked about what Cedric did and Maurice did, Cedric did and Maurice did, Cedric did and Maurice did."); *id.* at 1951 ("Cedric and Maurice was [sic] talking about making a hit. This is before Jamel was even in the car."); *id.* at 1951–52 ("Cedric told Jamel—and I wrote it down. Y'all remember it, told Jamel to get in the car. Not, 'Hey, you, let's go, if you want to. Why don't you come with us?' Terry said that Cedric told Jamel to get in the car."); *id.* at 1952 ("Cedric and Maurice were giving directions."); *id.* ("Who is running the show? Cedric, and to some degree, Maurice."); *id.* at 1953 ("Those [Cedric and Maurice] are your movers and shakers on this."); *id.* at 1963 ("We know Cedric shot. We know that."); *id.* at 1965 ("Cedric had the sack, talking about the money."); *id.* at 1967 ("Who provided the guns? Cedric and Maurice. Who planned it? Cedric and Maurice. Who carried the money out and food stamps? Cedric and Maurice. Oh, and the perfume. And who planned the get away to go to Florida? Cedric and Maurice. Who pumped the gas? Cedric.

Who paid for it? Maurice. And right on down the line."). Introducing evidence that Cedric was mentally retarded would have severely undercut this line of argument. No competent counsel would have introduced evidence of Brown's mental retardation in light of this choice of theory. Because petitioner has failed to establish that no competent counsel would have chosen to present this theory of the case, the Court finds that petitioner's trial counsel were not constitutionally ineffective in declining to introduce evidence that was inconsistent with their theory of the case. *Provenzano,* 148 F.3d at 1332.

### 4. Failure to Object to Hearsay and Other Improper Testimony Provided by Bart Ingram

■ Petitioner alleges that his trial counsel were deficient for failing to object to hearsay and other improper testimony provided by Bart Ingram. Special Agent Ingram testified about Florida law enforcement's attempts to locate petitioner, Cedric Brown, and Maurice Fleming in Miami and Opalocka, Florida and their attempts to locate the other gun used in the murder. Resp't's Ex. 15 at 1742–73. Agent Ingram testified that he spoke with Jim Gray, Lucy Stacy, Terry Stacy, and Keith Moran and developed information that led him to petitioner, Brown and Fleming and that caused him to search for the other weapon in the yard of an abandoned Miami house. *Id.* At the beginning of this testimony, Mr. Walker, co-counsel for petitioner, objected that the testimony was based on hearsay, but his objection was overruled. *Id.* at 1743–44.

Even if counsel's failure to object more vigorously to this testimony could be considered error, petitioner has failed to show how this error prejudiced his defense. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The bulk of Ingram's testimony merely established that petitioner was found in Florida with Cedric Brown and Maurice Fleming, a fact presented to the jury through the testimony of Terry Roberts, Detective James Smith, and Ramone Augusto. Resp't's Ex. 15 at 1742–49 (In-

gram's testimony as to search for and capture of petitioner, Brown, and Fleming); *id.* at 1675–78 (testimony of Terry Roberts concerning petitioner, Brown, and Fleming taking a bus to Miami); *id.* at 1777–79 (testimony of Detective James Smith concerning capture of petitioner with Brown and Fleming at motel in Opalocka, Florida); *id.* at 1806–11 (testimony of motel operator Ramone Augusto concerning how petitioner, Brown, and Fleming checked into the hotel and their ultimate capture).

Furthermore, Ingram's testimony concerning the search for the gun did not implicate petitioner. *Id.* at 1755–58. Ingram specifically stated that no gun was found during the search of the abandoned house's yard and that he did not recall being informed of who allegedly disposed of the pistol. *Id.* at 1758 (stating no gun was found in the search); *id.* at 1766 (stating he did not recall being informed of who allegedly disposed of the pistol). Indeed, this testimony tends to highlight the weakest part of the prosecution's case: that the murder weapon allegedly used by petitioner was never found. Consequently, there is no reasonable probability that the result of the proceeding would have been different had petitioner's counsel objected to this testimony. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Thus, the Court finds that petitioner has failed to establish that this alleged error prejudiced his defense and deprived him of his constitutional right to effective assistance of counsel.

### 5. Failure to Object to Improper Testimony about Other Crimes

■ Petitioner alleges that his trial counsel were deficient in failing to object to direct examination testimony by Terry Roberts concerning other crimes with which Shawn Brown, Cedric Brown, and Maurice Fleming had been charged. Resp't's Ex. 15 at 1658, 1660 (testimony of Terry Roberts describing how Maurice and Cedric had bench warrants on them and how Shawn had been arrested at school earlier on the day of the murder). This information was also elicited by petitioner's own counsel on cross-examination;

Resp't's Ex. 15 at 1693, 1696, 1698; and was an integral part of defense counsel's closing argument; Resp't's Ex. 16 at 1952, 1954.[25] Consequently, the failure to object to this testimony was clearly part of petitioner's counsel's trial strategy. Because petitioner has failed to establish that this strategy was unreasonable, i.e., that no competent counsel would have made a similar choice, the Court finds that petitioner's counsel were not deficient in failing to object to the testimony. *Provenzano*, 148 F.3d at 1332.

### 6. Failure to Object to Prosecutor's Use of Leading Questions

 Petitioner next contends that his trial counsel were deficient in failing to object to the prosecutor's use of leading questions. The Georgia Supreme Court found "no abuse of the trial court's discretion in regard to the prosecution's alleged use of leading questions." *Jenkins II*, 491 S.E.2d at 58. Consequently, petitioner cannot establish that failure to object to these questions prejudiced his defense. *Johnston*, 162 F.3d at 644 (finding no prejudice exists when counsel fails to timely object to conduct by prosecutor and court which did not violate Constitution or Supreme Court precedent). Furthermore, petitioner has provided no Supreme Court precedent that establishes that failure to object to the use of leading questions is constitutionally deficient behavior on the part of trial counsel. · Accordingly, peti-

tioner has failed to meet the requirements of *Williams*, and consequently, this allegation cannot form the basis of habeas relief. *Williams*, 120 S.Ct. at 1523.

### 7. Failure to Object to Errors Made during the Prosecutor's Summation during the Guilt and Penalty Phases of the Trial

 Petitioner asserts that his trial counsel were deficient for failing to object to several alleged errors made by the prosecutor during his guilt and penalty phase summations. These alleged errors include misleading the jury regarding the applicable law, misrepresenting evidence, and appealing to the jury's passions and emotions. Reading the prosecutor's summation in context, there is no error in his argument. The prosecutor's statements about the Georgia law of parties to a crime[26] were not error for the reasons discussed *supra* in Part C. His statements about the silent witness information[27] were not error for the reasons discussed *supra* in Part B. Furthermore, many of the alleged misstatements of the evidence were immediately corrected or clarified by the prosecutor in the very next sentence of his argument.[28] The remaining statements, although not precise restatements of the evidence, varied so minimally from the actual testimony given as not to be misleading.[29] Finally, the prosecutor's alleged appeal to the passions and emotions of the jury during the guilt phase of the

25. Indeed, petitioner's counsel used the information to support their allegations that the "movers and shakers" behind the murder were Maurice Fleming and Cedric Brown, wanted men and fugitives, and that Terry Roberts lied to protect his half-brother Maurice Fleming from further trouble with the law. Resp't's Ex. 16, at 1951–54.

26. Resp't's Ex. 16 at 1912–15.

27. Resp't's Ex. 16 at 1919.

28. Resp't's Ex. 16 at 1916 ("We know that there were two fatal wounds. Or possibly one that could be fatal, except for the seriousness of the first one."); *id.* at 1923 ("[Terry Roberts] testified that two guns were used. That two, Cedric Brown and Clevon Jamel Jenkins,

both had guns. The evidence found at the scene shows there were two guns used."); *id.* at 1937 ("Now the bleeding that occurred on the floor was such that it did not occur initially. That's when the blood basically fills up on the interior parts of the body, as Dr. Clark testified, and then comes out. The spurting blood, the arterial bleeding, occurred there at the desk. And further, there was no reason that they would have gotten blood on them from that situation after he was shot there at the desk.").

29. The prosecutor stated that some shell casings found at the scene were from the weapon which was not recovered. Resp't's Ex. 16 at 1921. The firearms expert only testified that one casing came from the weapon not recovered. *Id.* at 1871–72. Petitioner has failed to

trial was not error.[30] Read in context, the prosecutor was not urging the jury to render a verdict based on community standards instead of the evidence. Indeed, immediately before the allegedly improper statements, the prosecutor stated "The State contends the evidence is clear that they went in there with one intent and one intent only, to shoot Mr. Bobby Hodges and take his money.... So—so it's the State's contention the evidence is clear that this is a malice murder case, that they went in for that purpose." Resp't's Ex. 16 at 1940. Additionally, in the middle of his comments, the prosecutor stated, "We ask that you deliberate, consider all the evidence. It's in your hands." *Id.* at 1941. Read in context, the comments were merely a comment on the jury's representative and policy role in the criminal justice system, and such comments are proper. *Spivey v. Head,* 207 F.3d 1263, 1276–77 (11th Cir.2000). Because the prosecutor's comments were not error, petitioner can show no prejudice as a result of his counsel's failure to object to the comments. *Johnston,* 162 F.3d at 644.

### 8. Failure to Object to Prejudicial Remarks Made by the Trial Court Regarding the Issue of Whether a Conspiracy Existed

Petitioner's last ground asserts that his counsel were deficient in failing to object

to improper comments by the court. Resp't's Ex. 15 at 1667. The Georgia Supreme Court found that the court's comments were a ruling on a point of law and thus were not improper. *Jenkins II,* 491 S.E.2d at 59. Even a cursory review of the record indicates that this was a ruling on a hearsay objection raised by petitioner's counsel. The timing of this ruling and the decision to admit the testimony were not error for the reasons set forth *supra* in Part J. Because there was no error by the trial court, counsel's failure to object did not prejudice the defense. *Johnston,* 162 F.3d at 644

### M. Denial of Motion for Change of Venue (Ground Fourteen)

In his fourteenth ground, petitioner alleges that he was denied due process of law because of prejudicial pretrial publicity. To establish that pretrial publicity prejudiced petitioner, he must show that the pretrial publicity was sufficiently prejudicial and inflammatory and that the prejudicial pretrial publicity saturated the community where the trial was being held. *Spivey v. Head,* 207 F.3d 1263, 1270 (11th Cir.2000) (citing *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)).

Petitioner has failed to establish that any pretrial publicity saturated the com-

---

establish how the use of the word "some" instead of the precise number of shell casings found prejudiced his defense. The import of the testimony and the prosecutor's argument was that another weapon was used in the crime. Whether that weapon fired one shot or many was immaterial. The prosecutor also stated that Detective Smith "didn't know enough about the case to start questioning [petitioner]." *Id.* at 1931. In his direct testimony, Smith testified that he did have information to question petitioner, but that he did not initiate such questioning. Resp't's Ex. 15 at 1775. Whether Detective Smith knew enough to question petitioner is not the important issue here. The purpose of the testimony and the prosecutor's argument was to inform the jury that petitioner's statement to Detective Smith was spontaneous and not the result of formal questioning by Detective Smith. Consequently, petitioner has failed to

establish how this variance prejudiced his defense. Finally, in the penalty phase of the trial, the prosecutor stated that immediately after the robbery, petitioner said "Bang, bang, Maurice, I got him for you. I got him for you, Man. Hey, they picked up somebody else for that—for that murder, for the armed robbery. We made it." Resp't's Ex. 16 at 2088. Terry Roberts testified that petitioner stated "Yeah, yeah, yeah, I got him, bang, bang." Resp't's Ex. 15 at 1669. He also testified that petitioner and Cedric Brown were joking about the fact that someone else was arrested for the murder. *Id.* at 1677. The prosecutor's comments capture the essence of Terry Roberts's testimony concerning the statements made by petitioner. Accordingly, these statements were not error and were not prejudicial to the defense.

**30.** Resp't's Ex. 16 at 1940–41.

munity in which his trial was held. Petitioner argues that 22.64 percent of the jurors were excused for preconceived views, bias or prejudice, that 9.43 percent were excused on the basis of relationship to the victim,[31] and that a total of 35.5 percent were excused because of bias, prejudice or relationship. Mem.Supp.Pet. Habeas Corpus at 100. However, these percentages are inaccurate. Petitioner calculated this percentage as the number excused for bias, prejudice or relationship divided by the total number excused. *Jenkins II*, 491 S.E.2d at 57. The correct procedure requires that the percentage be calculated as the number excused for bias, prejudice or relationship divided by the total number questioned. *Irvin v. Dowd*, 366 U.S. 717, 727, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (calculating percentage by reference to all those examined on the issue of bias, not by reference to all those excused); *Spivey*, 207 F.3d at 1270–71 (calculating the percentage based on the total number of prospective jurors and not the total number of those excused).[32]

■ The record clearly shows that 104 potential jurors were questioned. Of these, five were excused because they were related to the victim; eight were excused for having preconceived opinions, bias or prejudice; three were excused for having knowledge of the facts of the case; and one was excused for believing that anyone charged with a crime is automatically guilty. Resp't's Ex. 17 at 4. When the percentages are properly calculated, 4.8 percent were excused because they were related to the victim; 7.69 percent were excused because they had preconceived opinions, biases, or prejudices; 2.88 percent were excused for having knowledge of the facts of the case; and 0.96 percent were excused for believing that anyone charged with a crime is automatically guilty. Consequently, 11.53 percent were excused for some form of bias that might be traced to pretrial publicity, and a total of 16.33 percent were excused for bias, prejudice or relationship to the victim. The low percentage of potential jurors excused for prejudice resulting from pretrial publicity is strong evidence of the absence of prejudicial community bias which would require a change of venue. *Spivey*, 207 F.3d at 1271. In light of these calculations, petitioner has failed to establish that the trial court's denial of the motion for change of venue and the Georgia Supreme Court's decision upholding that denial are an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1); *Williams*, 120 S.Ct. at 1523.

### N. Jury's Question Regarding Parole Eligibility (Ground Fifteen)

■ Petitioner claims that the trial court violated his due process rights by failing to answer the jury's question regarding when he would be eligible for parole. Mem.Supp.Pet. Habeas Corpus at 105. The Supreme Court has held that when the state relies in part on a defendant's future dangerousness, the defendant is entitled to have the jury informed if he is, in reality, ineligible for parole. *Simmons v. South Carolina*, 512 U.S. 154, 168–69, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). However, as the *Simmons* Court noted,

In a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death pen-

---

31. In his memorandum, petitioner asserts that 9.43 percent were excused for relationship with the parties. However, the 9.43 figure is actually related to the number excused for relationship with the victim or his family.

32. To illustrate the absurdity of petitioner's method of calculation, consider the following hypothetical. Suppose 100 jurors were questioned and only one juror was excused for cause. Suppose this one juror was excused due to exposure to prejudicial pretrial publicity. Under petitioner's method of calculation, the pretrial publicity saturation rate would be 100% even though only one juror out of 100 had any exposure to pretrial publicity. Clearly, petitioner's method of calculation tends to inflate the saturation rate and would require venue changes in cases where such changes would be unnecessary.

alty is speculative, and we shall not lightly second-guess a decision whether or not to inform a jury of information regarding parole. States reasonably may conclude that truthful information regarding the availability of commutation, pardon, and the like should be kept from the jury in order to provide 'greater protection in [the States'] criminal justice system than the Federal Constitution requires.'

*Id.* at 168, 114 S.Ct. 2187 (internal citations omitted).

In the instant case, the jury was accurately informed that three sentencing options faced them: death, life without parole, and life with possibility of parole. The jury were informed that parole was available under the latter option, but were not informed exactly when said parole would be available. Plaintiff has pointed to no clearly established Supreme Court precedent that would require the trial court to give the jury that information. Indeed, *Simmons* indicates that whether or how to reveal such details to the jury is a matter for the states to decide. Accordingly, the Court will not grant habeas corpus relief on this ground. *Williams,* 120 S.Ct. at 1523.

### O. Exclusion of Co-defendants' Sentences as Mitigation Evidence (Ground Sixteen)

■■■ Petitioner next contends that the trial court violated his due process rights by excluding evidence of his co-defendants' sentences at the sentencing phase of his case. Mem.Supp.Pet. Habeas Corpus at 105. The Supreme Court has clearly established that the Constitution requires that the sentencing jury in a capital case not be precluded from considering "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). However, the Court also noted that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence

not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 604 n. 12, 98 S.Ct. 2954. Evidence of his co-defendants' sentences clearly have no bearing on the petitioner's character, prior record, or the circumstances of his offense. Petitioner has provided no Supreme Court authority for the proposition that evidence of co-defendants' sentences are constitutionally relevant mitigating evidence which must be presented to the jury during the penalty phase of a death penalty trial. Accordingly, the Georgia Supreme Court was not acting contrary to clearly established Supreme Court precedent when it ruled that such comparisons are to be made by the appellate courts of Georgia and not the jury. *Jenkins II,* 491 S.E.2d at 58. Accordingly, the Court will not grant habeas corpus relief on this ground. *Williams,* 120 S.Ct. at 1523.

### P. Constitutionality of the Georgia Life without Possibility of Parole Statute (Ground Seventeen)

■■■ Petitioner argues in ground seventeen that the Georgia life without possibility of parole statute, O.C.G.A. § 17–10–31.1, is unconstitutional because it authorizes jurors to impose life without possibility of parole in the same categories of cases in which jurors are authorized to impose the death penalty. Mem.Supp.Pet. Habeas Corpus at 107–08. However, the Supreme Court dismissed this very argument in *Gregg v. Georgia,* 428 U.S. 153, 203, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In that case, the defendant argued that Georgia's death penalty scheme was unconstitutional because even if the jurors found the requisite aggravating circumstances, they were still entitled to impose a life sentence if they so desired. In addressing this argument, the Supreme Court held,

The petitioner next argues that the requirements of *Furman* are not met here because the jury has the power to decline to impose the death penalty even if it finds that one or more statutory aggravating circumstances are present in the case. This contention misinterprets

*Furman.* Moreover, it ignores the role of the Supreme Court of Georgia which reviews each death sentence to determine whether it is proportional to other sentences imposed for similar crimes. Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.

*Id.* The life without possibility of parole statute merely codifies what Georgia juries were allowed to do all along and provides a third sentencing option for them to choose from. Consequently, O.C.G.A. § 17–10–31.1 is not unconstitutional, and its use in this case does not provide grounds for habeas corpus relief.

### Q. Denial of Cumulative Error Relief (Ground Eighteen)

Petitioner next claims that the Georgia courts' failure to recognize the cumulative error rule deprived him of due process of law. Mem.Supp.Pet. Habeas Corpus at 108–110. However, petitioner conceded in his brief that "no Supreme Court case has been found which explicitly states that it is a requirement of federal constitutional law that states must consider the cumulative effect of multiple constitutional errors in order to decide whether a criminal defendant has been deprived of due process of law." *Id.* at 108. Because there is no clearly established Supreme Court precedent requiring this rule, petitioner has failed to meet the requirements of *Williams,* and the Court finds this ground insufficient to state a claim for habeas corpus relief. *Williams,* 120 S.Ct. at 1523.

### R. Constitutionality of the Amended 28 U.S.C. § 2254(d) (Ground Nineteen)

Petitioner's last ground is that the 1996 amendment to § 2254(d) is unconstitutional because it limits federal courts' ability to interpret and apply federal law as that law is decided by the Circuit Courts. Mem.Supp.Pet. Habeas Corpus at 111. However, as Justice Stevens noted in *Williams,* although this provision " 'extends the principle of *Teague [v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) ] by limiting the source of doctrine on which a federal court may rely in addressing the application for a writ[, i]t does not, however, purport to limit the federal courts' independent interpretive authority with respect to federal questions.' " *Williams,* 120 S.Ct. 1495, 1507, 146 L.Ed.2d 389 (2000) (quoting *Lindh v. Murphy,* 96 F.3d 856, 869 (7th Cir.1996)). Accordingly, the Court finds that 28 U.S.C. § 2254(d) is not unconstitutional.

### V. CONCLUSION

For the foregoing reasons, petitioner has failed to show that he is entitled to habeas corpus relief under 28 U.S.C. § 2254. Accordingly,

**IT IS HEREBY ORDERED** that petitioner's petition for habeas corpus relief is denied.